IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-cr-438-ECM-JTA |
| | ) | |
| BRIAN KEITH SELLERS | ) | (WO) |
| | ) | |

### RECOMMENDATION OF THE MAGISTRATE JUDGE

This cause is before the court on Defendant Brian Keith Sellers' motion to suppress (Doc. No. 20), the government's response in opposition (Doc. No. 25), and Sellers' reply thereto (Doc. No. 31). After due consideration of the parties' arguments, evidence and applicable law, the court concludes that the motion to suppress is due to be denied.

### I. PROCEDURAL HISTORY

Brian Keith Sellers was arrested by Millbrook police officers after a warrantless search of his vehicle on June 10, 2021. He was charged by a grand jury in the Middle District of Alabama in a three-count indictment on October 27, 2021. (Doc. No. 1.) The indictment charges Sellers with three federal firearms offenses. (*Id.*) Sellers entered a plea of not guilty to each count during his arraignment on December 15, 2021. (Doc. No. 11.)

Sellers filed his motion to suppress evidence and statements on February 11, 2022. (Doc. No. 20.) After receiving the United States' response and Sellers' reply thereto, the undersigned conducted an evidentiary hearing on the motion on March 1, 2022. (Doc. No. 38, Transcript of Evidentiary Hearing.) The motion is ripe for review.

## II.  FINDINGS OF FACT

The testimony from the hearing demonstrates that shortly before 8:00 a.m. on June 10, 2021, Millbrook Police Officer Duntrevious Esco[1] encountered a black sedan.[2] He ran a license plate check on the vehicle, discovered that the plate was registered to another vehicle, and initiated a traffic stop near the intersection of Magnolia Drive and Deatsville Highway in Millbrook, Alabama. (Doc. No. 38, Tr. at 8, 9, 14-15, 21.) When Esco initiated his emergency equipment in his vehicle, he observed the driver of the black vehicle reach around the vehicle cabin. When that vehicle came to a rest, Esco observed the driver reach under his seat with his right hand and remove his seat belt with his left hand. Esco suspected the driver may have been reaching for a firearm in the vehicle, so he requested assistance for officer safety purposes.

Esco exited his vehicle and approached the black vehicle. As Esco stood next to the black vehicle, he observed a jumper cable box, a compound bow and a bag of tools which included drills, a Sawzall[3] and a flashlight, on the back seat. Esco greeted the driver of the black vehicle and the driver immediately explained that he lost his current license but had

---

[1] Esco was the Government's only witness at the evidentiary hearing. (Doc. No. 38, Tr.) His testimony tracked the events depicted in his body camera recording of the incident (Govt. Ex. C) and the body camera recording from Millbrook Police Corporal K. Bryant (Govt. Ex. A). Although the time of Esco's video begins at 12:59:13, the parties stipulated that the stop was initiated at 7:59 a.m. on June 10, 2021. (Doc. No. 38, Tr. at 8.) Seller's only witness at the evidentiary hearing was Orlando Gonzalez, Investigator for the Federal Defender's Office. (Doc. No. 38, Tr.)

[2] The exhibits list the vehicle as both a 2003 Nissan Sentra and 2003 Toyota Corolla. It is unclear in the record which type of vehicle is at issue in this case.

[3] Although "Sawzall" is a registered trademark of Milwaukee Tool, the term is frequently used to describe any brand of reciprocating saw that is capable of cutting through lumber, metal, plywood, plastic and cast iron pipe. *See* https://www.familyhandyman.com/article/diy-dictionary-sawzall/.

an old one. The driver held the license outside of his window and dropped it on the ground. (Govt. Ex. C at 13:00:00 - 13:00:09.) Esco picked up the license and the license identified the driver as Nathaniel Smith.[4] Esco wrote down the driver's license number of the female passenger and explained that the tag on the car "comes back to" a different vehicle. (Govt. Ex. C at 13:00:09 - 13:00:51.) The driver responded that "his girl" recently bought the vehicle and put the tag from another vehicle on that vehicle. (Govt. Ex. C at 13:00:54 - 13:01:59.) Esco asked if there were any weapons in the vehicle and the driver quietly said "no, sir" while looking down. The driver then gave Esco an Alabama Title for Motor Vehicle and a handwritten bill of sale. (Govt. Ex. C at 13:01:02 - 13:01:20.) Upon inspection of the documents, Esco asked the female passenger her name. She responded that her name was Kaila Bringhurst and clarified that she was not the owner of the vehicle. With the documents in hand, Esco returned to his vehicle. (Govt. Ex. C at 13:01:40 - 13:01:59.)

Using the equipment in his vehicle, Esco immediately determined that on June 1, 2021, he arrested the registered owner of the black vehicle, Tammy Wellman. Esco had conducted a traffic stop on Wellman for a switched tag and arrested her for an outstanding warrant and possession of methamphetamine. Esco called his supervisor, Lieutenant S. Youngblood, to explain that he was conducting a stop on the same car Wellman was driving

---

[4] Esco testified that, based upon this training and experience, the driver's appearance (i.e., missing teeth, very dry skin, loose and dirty clothing, and prison tattoos) showed the use of methamphetamine. (Doc. No. 38, Tr. at 19-20.)

when she was arrested, that the occupants of the car were "showing signs of 'other things'[5]" and that the driver "was reaching a lot" and had "a lot of tools.[6]"  As Esco was reporting these signs to Youngblood,[7] he ran the license of Nathaniel Smith.  Esco's system reported a high alert warning[8] for Smith because he had 20 felony charges and no active warrants. (Govt. Ex. C at 13:02:19 - 13:04:36.)  Esco's observation of a Sawzall and flashlight in the back seat of the black vehicle indicated to him that the occupants of the vehicle may have been involved in the theft and sales of catalytic converters, a common activity of methamphetamine users who sell the stolen items to get money for narcotics.  At the time of the stop, "a lot" of catalytic converter thefts from vehicles were being reported in Millbrook.

Approximately six minutes after the stop began, Youngblood arrived with Corporal K. Bryant.  Esco explained to Youngblood that he noticed Bringhurst repeatedly reaching over to the driver and the armrest/seat area of the vehicle before it came to a stop.  Esco then turned the traffic stop over to Youngblood for the issuance of citations.  Esco returned to the driver side of the black vehicle and Bryant positioned himself on the passenger side. Esco requested the driver to exit the vehicle and the driver responded by asking why the

---

[5] Esco testified that his reference to "signs of other things" meant narcotic use. (Doc. No. 38, Tr. at 28.)  He further testified that Bringhurst also had missing teeth.  (*Id*.)

[6] Esco testified that his reference to "tools in the back seat" meant his previous encounter with known drug users and previous traffic stops.  (Doc. No. 38, Tr. at 29.)

[7] Esco testified that at this time he was "extremely nervous and [he] was stumbling over his words." (Doc. No. 38, Tr. at 91, 102.)  Esco further testified that he was so nervous due to the driver's movements and afraid that he was going to be shot.  (*Id*. at 91, 100.)

[8] Esco testified that a high alert warning informs an officer "[t]o be more aware of that individual." (Doc. No. 38, Tr. at 30.)

car was being searched and telling Esco that he needed probable cause or a warrant to conduct a search. Esco testified that he had not decided to search the car at that point but wanted the driver to exit the vehicle so he could conduct a pat down due to the driver's suspicious movements, which was standard procedure for officer safety. (Doc. No. 38, Tr. at 32-33, 35.) Following the driver's refusal to exit the vehicle, Esco asked the driver and Bringhurst to exit while counting to three repeatedly. After directing Bringhurst where to stand upon her exit from the car, Bryant returned to the passenger side of the black vehicle, drew his taser and pointed it at the driver, stating "hey man, step out the car." (Govt. Ex. A at 13:05:57 - 13:06:20.) The driver exited the vehicle and continued to ask whether probable cause existed for a search while Esco placed him in handcuffs. (Gov. Ex. C at 13:05:42 - 13:06:59.)

Esco escorted the driver to the rear of the black vehicle where Bringhurst, who was not handcuffed, stood next to Bryant. (Govt. Ex. C at 13:06:59 - 13:07:08.) Esco then walked to his vehicle, told Youngblood to open the trunk and then retrieved rubber gloves. (Doc. No. 38, Tr. at 35; Govt. Ex. C at 13:07:19-13:07:44.) Esco returned to stand by the driver, began placing his hands in the gloves, and inquired if anything was inside the vehicle he should know about. The driver responded that he did not know the contents of the car because it was not his car. Esco testified this response caused him to decide to search the car because he believed that the driver was "attempting to hide evidence." (Doc. No. 38, Tr. at 36; Govt. Ex. C at 13:07:51 - 13:08:13.) The driver continued to move nervously about while Esco asked him questions about the contents of the vehicle. (Govt. Ex. C at 13:08:02 - 13:08:24.) Bryant then walked the driver away from the black vehicle

5

and toward a police vehicle while Esco asked Bringhurst if there was anything in the vehicle he should know about because he saw "a lot of movement" as he was pulling them over. Bringhurst responded that she was reaching for her phone and did not have anything. (Govt. Ex. C at 13:08:24 - 13:09:16.) Esco then walked to the driver side of the black vehicle, reached inside, and recovered a black bag from the floor of the driver's seat. (Govt. Ex. C at 13:09:18 - 13:09:33.) A firearm was discovered in the black bag. (Govt. Ex. A at 13:09:24 - 13:09:34.)

During the same time frame, Bryant conducted a pat down search of the driver and discovered a syringe in one of his pants pockets. (Govt. Ex. A at 13:08:42 – 13:09:03.) As Bryant completed his search of the driver, Esco can be seen in the top left of Bryant's body camera video shortly before Esco searched the vehicle and discovered the firearm.[9] (Govt. Ex. A at 13:09:14.) At this point, Bringhurst revealed after more thorough questioning that she was in possession of a "bowl" or glass pipe commonly used to consume narcotics. Bringhurst removed the item from her pants and provided it to Bryant.

The officers arrested the driver and transported him to the Elmore County Jail. While being booked into the jail, the driver revealed his true identity to law enforcement as Brian Keith Sellers.

---

[9] The record contains no communication between the officers when the pat down of the driver is completed that establishes Esco was informed that drug paraphernalia had been discovered on the driver's person prior to his search of the car. Esco testified that Bryant completed the pat down search of the driver before he searched the black vehicle. (Doc. No. 38, Tr. at 78, 104, 108.)

### III.   DISCUSSION

A.  <u>Motion to Suppress</u>

Sellers does not challenge the lawfulness of the traffic stop.  (Doc. No. 20 at 6-7.) He asserts, however, that the search of his person and the vehicle violated the Fourth Amendment because (1) there was no probable cause to believe the vehicle contained contraband and no exigent circumstances necessitated a warrantless search; (2)  the search of his person cannot be defended on officer safety grounds; and (3) the discovery of the firearm cannot be justified as the product of inevitable discovery during an inventory search.[10]  (*Id*. at 6-7, 8, 9-11.)

B.  <u>Response</u>

The Government argues that the search of Sellers' person was undertaken for officer safety purposes. The Government also argues that the vehicle search[11] was lawful under the automobile exception to the warrant requirement of the Fourth Amendment. Alternatively, the Government argues that the firearm would have inevitably been

---

[10] Sellers established during the suppression hearing that the Millbrook Police Department does not have written procedures for inventory searches.  (Doc. No. 38, Tr. at 80-81.)  His Reply reiterates his opposition to any reliance by the Government on the inevitable discovery doctrine through an inventory search left entirely to the discretion of officers.  (Doc. No. 31 at 2-3.)

[11] The Government does not challenge Sellers' Fourth Amendment "standing" to contest the search of the vehicle.  (Doc. No. 25.)  *See United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) ("[T]hreshold issue of whether an individual has a reasonable expectation of privacy in the object of the challenged search" is known colloquially, but misleadingly, as "Fourth Amendment 'standing.' "); *see also Byrd v. United States*, ___ U.S.___, 138 S. Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits.").

discovered after the officers found the syringe on Sellers and the drug paraphernalia on Bringhurst. The Government contends that, though impoundment was likely in this case,[12] the Court need not reach the question of whether the search of the vehicle was lawful as an inventory search.

### C. Governing Legal Principles

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Whren v. United States*, 517 U.S. 806, 809 (1996). For the purposes of Fourth Amendment analysis, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "A traffic stop for a suspected violation of law is considered a seizure of the vehicle's occupant and must be conducted in accordance with the Fourth Amendment." *United States v. Braddy*, 11 F.4th 1298, 1308 (11th Cir. 2021). "Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred . . . ." *United States v. Monzon-Gomez*, 244 F. App'x 954, 959 (11th Cir. 2007) (quoting *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)). An officer may direct the driver and any passenger to exit the car during a stop. *United States v. Gibbs*, 917 F.3d 1289, 1296 (11th Cir. 2019); *Maryland v.*

---

[12] The Government concedes that the Millbrook Police Department does not have a written policy to guide its officers as to when to impound a vehicle and how to conduct an inventory search. (Doc. No. 25 at 9-10.)

*Wilson*, 519 U.S. 408, 414-15 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977).

An encounter rises to the level of a brief seizure or investigatory detention if the officer has a reasonable, articulable suspicion that the individual has engaged in or is about to engage in criminal activity. *Terry*, 392 U.S. at 24; *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) ("[E]ven in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity.") "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Reasonable suspicion is determined from the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. *Terry*, 392 U.S. at 21; *see also United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007); *see also United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). For a seizure to be valid, it must be "justified at its inception." *May v. City of Nahunta, Ga.*, 846 F.3d 1320, 1328 (11th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). To determine the lawfulness of an officer's actions, the court considers only those "facts available to the officer at the moment of the seizure." *United*

*States v. Mestre*, 362 F. Supp. 3d 1175, 1178 (M.D. Ala. 2019) (quoting *Terry*, 392 U.S. at 21-22).

Probable cause is assessed "from the standpoint of an objectively reasonable police officer." *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 586 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "Because probable cause 'deals with probabilities and depends on the totality of the circumstances,' it is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules. It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (internal citations and quotations omitted). "Probable cause 'is not a high bar.' " *Wesby*, *id* (quoting *Kaley v. United States*, 571 U.S. ___, ___, 134 S. Ct. 1090, 1103 (2014)). When making probable cause inquiries "the totality of the circumstances – the whole picture – must be taken into account. [This] process does not deal with hard certainties, but with probabilities." *United States v. Johnson*, 921 F.3d 991, 998 (11th Cir. 2019) (internal citations and quotations omitted).

Turning to the Fourth Amendment's proscription of unreasonable searches, the fundamental right to be free from unreasonable searches is "generally preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer upon a showing of probable cause." *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). "There are, of course, exceptions to the general rule that a warrant must be secured before a search is undertaken, one of which is the automobile exception." *Id*. (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam)). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth

Amendment permits police to search the vehicle without more." *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)); *see also United States v. Mobley*, 808 F. App'x 899, 901 (11th Cir. 2020).

In *Nix v. Williams*, 467 U.S. 431 (1984), the Supreme Court adopted the inevitable discovery exception to the exclusionary rule and permitted the admission of evidence that resulted from an illegal search or seizure. The exception struck a balance between the exclusionary rule's purpose of deterring police misconduct and the "high social cost of allowing obviously guilty persons to go unpunished" by allowing the admission of evidence if "the information ultimately or inevitably would have been discovered by lawful means." *Jefferson v. Fountain*, 382 F.3d 1286, 1295 (11th Cir. 2004), *overruled on other grounds by United States v. Watkins*, 10 F.4th 1179 (11th Cir. 2021). The Supreme Court found that "[w]hen the evidence inevitably would have been discovered, the public interest in having juries receive all probative evidence of a crime outweighs the need to discourage police misconduct." *Id*. at 1295-1296 (citation omitted). Prior to the *Nix* decision, the Eleventh Circuit followed the elements of the inevitable discovery exception where there was "a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Jefferson*, 382 F.3d at 1296 (citing *United States v. Brookins*, 614 F.2d 1037 (5th Cir. 1980)). "The "government must show the exception's applicability 'by a preponderance of the evidence' using 'demonstrated historical facts.' " *Mobley*, 808 F.

11

App'x at 902 (quoting *United States v. Terzado-Madruga*, 897 F.2d 1099, 1114 (11th Cir. 1990)); *United States v. Watkins*, 13 F.4th 1202, 1211 (11th Cir. 2021).

    D. <u>Analysis of the Motion to Suppress</u>

    1.  The traffic stop was lawful.

"A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). *See also United States v. Clark*, 32 F.4th 1080, 1087-88 (11th Cir. 2022) (stating that "an officer may stop a car 'when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic violations and an equipment regulations relating to the operation of motor vehicles.' "); *Monzon-Gomez*, 244 F. App'x at 959 (an automobile stop is reasonable where the police have probable cause to believe that a traffic violation occurred).

Sellers concedes the stop was valid if it was based upon Esco's belief that the vehicle displayed a switched tag in violation of Ala. Stat. § 32-8-86(e).[13] (Doc. No. 20 at 6-7.) The evidence before the court supports this concession. Esco's body camera recording shows his communication with Millbrook Police in which he references stopping the same car on June 1, 2021 and arresting the owner for possession of methamphetamine. (Govt. Ex. C at 13:02:14 - 13:03:50; Doc. No. 38 Tr. at 25.)[14] Esco stopped the driver of that same vehicle on June 1, 2021. Accordingly, probable cause of a traffic violation existed

---

[13] "A person who removes a license plate or tag from a vehicle or affixes to a vehicle a license plate or tag not authorized by law for use on it, in either case with intent to conceal or misrepresent the identity of a vehicle or its owner, is guilty of a Class A misdemeanor and shall be punished as required by law." Ala. Stat § 32-8-86(e) (1975).

[14] The evidence before the court includes the Alabama Uniform Incident/Offense Report for Esco's stop of Tammy Wellman in the same vehicle on June 1, 2021. (Doc. No. 25-2 at 1-2.)

here because Esco was investigating a vehicle with a switched tag in violation of Alabama law. Thus, the stop was lawful.

    2. Probable cause existed to search the vehicle.

The totality of the circumstances led Esco to believe that the vehicle contained evidence of criminal activity. During his initial contact with the vehicle immediately after the stop, Esco observed that Sellers possessed at least two key items commonly used in the catalytic converter thefts frequently reported in Millbrook at that time – an electric saw and a flashlight. (Doc. No. 38, Tr. at 29.) Esco testified that in his training and experience from past traffic stops, the presence of such tools were indicators that the owners were involved in illegal activity. (*Id*.) Upon running the driver's license for Nathaniel Smith that was provided by Sellers, Esco was warned that he should be on high alert due to Smith's numerous felonies. (*Id*. at 30.) Esco testified that his request for Sellers and Bringhurst to exit the black vehicle was not made in anticipation of a vehicle search but rather to conduct standard pat down searches for officer safety, as the movements he observed them to make before their vehicle stopped were of concern to him. (*Id*. at 16, 33-34.) Sellers' resistance to this valid request led Esco to believe that Sellers was "attempting to hide something" from him. (*Id*. at 35.) "Where the initial traffic stop is legal, the officer has the duty to investigate suspicious circumstances that then [come] to his attention." *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1336 (N.D. Ga. 2009) (quoting *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (internal quotations omitted)); *United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2015) ("Once [an officer] develop[s] reasonable suspicion, he ha[s] a duty to investigate more."). Thus, the

stop became an investigatory detention supported by the reasonable, articulable suspicion that Sellers was engaged in criminal activity based upon Esco's observation of tools that could be used for criminal purposes and the vehement refusals by Sellers to comply with Esco's request to exit the vehicle.

Sellers' argument that the search violated the Fourth Amendment due to lack of probable cause because no drug paraphernalia had been discovered either when Esco decided to search or by the time the search began is unavailing. While the undersigned notes this is a keen observation by Sellers, the lack of drug paraphernalia at the time of the search does not negate the probable cause for the vehicle search that existed from the totality of the circumstances before Esco.

The undersigned finds the Eleventh Circuit's holding in *Clark*, 32 F.4th 1080, to be instructive. In *Clark*, the Eleventh Circuit found probable cause for a vehicle search where an officer initiated a stop because the vehicle was weaving and the driver continued for half a mile before stopping, then failed to immediately comply with the officer's command to exit his vehicle. *Clark*, 32 F.4th at 1088. The Circuit explained that it "evaluate[s] whether probable cause existed at the time of a traffic stop by viewing the stop 'from the standpoint of an objectively reasonable police officer.' " *Id.* Because probable cause is based on the "facts and circumstances within the officer's knowledge, . . . a prudent person [would] believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.*

Here, the circumstances before Esco were that tools commonly used in a property crime were possessed by "Smith," a man whom Esco believed had a lengthy criminal

14

record due to the high alert which sounded when Esco ran the driver's license. (Doc. No. 38, Tr. at 29-30.) Added to this knowledge was "Smith's" resistance to the command by Esco to exit the vehicle and "Smith's" repeated inquiry as to whether probable cause for a search existed although Esco had not asked to search the car. (*Id*. at 34-35; Govt. Ex. C at 13:05:57 - 13:06:20.) The video from Bryant's body camera shows that "Smith" only complied when a taser was pointed at him. (Govt. Ex. A at 13:05:57 - 13:06:20.) Once out of the vehicle, "Smith" continued to provide evasive answers regarding the contents of the vehicle. Based upon Esco's belief that he was dealing with a potentially dangerous felon whom he felt was attempting to hide criminal activity, he had probable cause to search the vehicle.

    3.   The vehicle search was lawful under the automobile exception.

"Under the automobile exception to the warrant requirement, '[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.' " *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). A warrantless search of an automobile is constitutional where (1) the automobile is readily mobile, and (2) there is probable cause to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299-1300 (11th Cir. 2011). *See also United States v. Tamari*, 454 F.3d 1259, 1261-62 (11th Cir. 2006) (holding a warrantless search permissible when "there is a fair probability that contraband or evidence of a crime will be found in the vehicle" under the totality of the circumstances). The burden of demonstrating an

applicable exception to the warrant requirement is on the government. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

Here, the Government has demonstrated that the automobile exception to the warrant requirement is applicable. First, Sellers' vehicle was readily mobile as he was driving it when Esco initiated the traffic stop. Second, there was probable cause to believe that the vehicle contained evidence of a crime because Sellers' movements in the vehicle before Esco approached were suspicious, Esco observed items used in catalytic converter thefts in the back seat of the vehicle, Sellers provided a driver's license of someone who had a lengthy criminal record, Sellers resisted exiting the vehicle as commanded by law enforcement, Sellers was evasive in answering questions regarding the content of the vehicle, and Sellers complained that probable cause was required to search the vehicle when Esco had not requested consent to search or mentioned searching the vehicle. Hence, Esco believed that the vehicle contained some form of contraband. Accordingly, the undersigned finds that, under the totality of the circumstances in this case, there was a fair probability that contraband or evidence of a crime would be found in the vehicle. *See Tamari*, 454 F.3d at 1261-62.[15]

4. The search of Sellers' person was lawful.

The undersigned is not persuaded by Sellers' argument that the pat down search of his person was unlawful. Sellers contends that he was no threat to officer safety when the pat down search occurred because he was handcuffed and outside of the vehicle. The

---

[15] The undersigned concludes it is unnecessary to determine whether the warrant exceptions of inevitable discovery and inventory search apply.

Eleventh Circuit has considered arguments against pat down searches of handcuffed suspects and found them unavailing. In *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) the Circuit rejected defendant's claim that he posed no danger to officers after being restrained by handcuffs. The Court stated "[h]andcuffs do not always work, and suspects have been known to reach for weapons even when handcuffed." *Johnson*, 921 F.3d at 1001 (quoting *United States v. Sanders*, 994 F.2d 200, 2009-10 (5th Cir. 1993) (rejecting the argument "that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will . . . do them harm")). Hence, in light of *Johnson*, the undersigned finds that the search of Sellers' person was lawful for officer safety purposes.[16]

## IV.  CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's motion to suppress (Doc. No. 20) be DENIED. It is further

ORDERED that the parties shall file any objections to the said Recommendation not later than **July 22, 2022.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

---

[16] While the discovery of the syringe alone is immaterial to the charges against Sellers, it is pertinent when considering if the pat down search of his person was lawful for officer safety. The syringe could have been used as a weapon at any point during Sellers' encounter with law enforcement.

Failure to file a written objection to the Magistrate Judge's findings and § 636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the District Court's order based on unobjected-to-factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11th Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 8th day of July, 2022.

/s/ Jerusha J. Adams
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE